# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

MICHAEL J. SCHNEIDERS,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-4092-MWB

**REPORT AND RECOMMENDATION**

---

## *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    A.    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    B.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        1.    *Introductory facts and Schneiders's hearing testimony* . . . . . . **3**
        2.    *Schneiders's medical history* . . . . . . . . . . . . . . . . . . . . . . . **7**
        3.    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . **12**
        4.    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

III.   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
       THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **15**

    A.    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **15**
    B.    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **18**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

# I. INTRODUCTION

The plaintiff Michael J. Schneiders ("Schneiders") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Schneiders claims the ALJ erred in presenting an incomplete hypothetical question to the VE, and in failing to make a proper evaluation of Schneiders's credibility. (*See* Doc. No. 19)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On August 28, 2003, Schneiders protectively filed an application for SSI benefits (*see* R. 4), and on September 8, 2003, he filed an application for DI benefits, alleging a disability onset date of January 6, 1998.[1] (R. 49-51) Schneiders alleged he was disabled due to chronic obstructive pulmonary disease (COPD), which he claimed prevented him from working due to shortness of breath and coughing until he passed out. (R. 67-68) His applications were denied initially and on reconsideration. (R. 31-36, 39-42; *see* R. 4)

Schneiders requested a hearing (*see* R. 43-44), and a hearing was held before ALJ George Gaffaney on December 15, 2004, in Sioux City, Iowa. (R. 256-95) Schneiders was represented at the hearing by attorney Wil Forker. Schneiders testified at the hearing, and Vocational Expert ("VE") Liz Albrecht also testified.

On April 25, 2005, the ALJ ruled Schneiders was not entitled to benefits. (R. 12-24) Schneiders appealed the ALJ's ruling, and on June 29, 2005, the Appeals Council denied Schneiders's request for review (R. 6-9), making the ALJ's decision the final decision of the Commissioner.

---

[1] During the ALJ hearing, the ALJ clarified that Schneiders worked through January 8, 2002. Schneiders stated he was not claiming disability for the time he was still working, and the ALJ concluded Schneiders had amended his alleged disability onset date to January 8, 2002. (*See* R. 16; 284-86)

2

Schneiders filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Schneiders's claim. Schneiders filed a brief supporting his claim on November 2, 2005. (Doc. No. 11) The Commissioner filed a responsive brief on December 19, 2005. (Doc. No. 12) Schneiders filed a reply brief on December 28, 2005. (Doc. No. 13) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Schneiders's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Schneiders's hearing testimony

At the time of the hearing, Schneiders was forty-seven years old. He is married and lives with his wife and one of their three children. His two other children, ages twenty-five and twenty-three at the time of the hearing, do not live in the home. Schneiders's wife is disabled due to fibromyalgia, and she receives SSI benefits. (R. 261-63)

Schneiders stated he was an average student in high school and he quit school before graduating, but he went back and got a G.E.D. in 1975. He served in the Marine Corps for most of 1975, but he broke both of his feet and was discharged with the rank of private first class. (R. 262, 291)

From August 1995 to January 1998, Schneiders worked at Gateway. He started out building computers on an assembly line. The job required him to lift anywhere from twenty to forty pounds at a time, which he did as many as 110 times a day. At that time, he had breathing problems that interfered with his work occasionally. He would have coughing spells and bronchitis, causing him to miss work. After a few months, he had worked his way up into software loading, which he did until he was fired for missing too

much work. Schneiders stated he missed a lot of work due to his and his wife's health problems. (R. 261, 263-65; *see* R. 89)

After he left Gateway, Schneiders worked for Systems Management off and on during 1999 and 2001, doing cleaning work. While working, he experienced shortness of breath, fatigue, and breathing problems. He stated he left the job in 1999, because grease in the work environment aggravated his condition. (R. 265-66; *see* R. 89, 92)

From 2000 to 2003, Schneiders worked intermittently as a sheet metal worker. The jobs required him to be on his feet, work at heights, and do heavy lifting. His breathing problems interfered with performing those jobs, as well. (R. 266; *see* R. 89-90, 93) According to Schneiders, he was fired from his last sheet metal job because he had a coughing attack and could not make it to work. He stated the job was in the wintertime, and the cold aggravated his condition. (R. 278)

From October 2001 to March or April 2002, Schneiders worked installing sheet rock, which required him to lift fifty pounds or more frequently. (R. 89, 91, 278) He was laid off from the job, he believes because the company knew about his breathing problems. (R. 279)

Until he left Gateway and lost his insurance, Schneiders saw Mike Jennings, M.D. for treatment of his COPD. (*See* R. 213-39) He did not seek treatment for a time after leaving Gateway due to lack of funds, and then in August 2004, he began seeing doctors at Siouxland Community Health, which charges on a sliding scale basis. (R. 206) Between 1998 and 2004, Schneiders continued to experience problems even though he was not seeing a doctor. He stated his symptoms remained basically the same, including bronchitis, asthma, breathing problems, coughing spasms, and head congestion. He stated over the years he has received temporary benefit from Prednisone tablets and other medications, but medications have not really helped alleviate his symptoms. (R. 268-69, 276)

Schneiders stated he has coughing spells at all times of the day and night. They worsen when he lies down, and he has to elevate himself to lie down. He stated the coughing spells interfere with his sleep and he has not "had a decent night's sleep in years." (R. 269) He is always short of breath, and breathing problems are brought on by "[a]ny kind of physical exertion or sometimes just the conditions of the atmosphere." (*Id.*) Weather and temperature changes affect him "[a] lot." (*Id.*) He cannot walk a full block before becoming short of breath. He stated he has "more or less adapted to it" because his condition has not changed for several years. He largely has eliminated activities that cause him shortness of breath. He goes grocery shopping on occasion, but he cannot walk the length of the store without experiencing problems. He stated he always carries an inhaler with him. If he climbs a flight of stairs, he usually will be gasping for air when he reaches the top. If he uses his inhaler, it will take him a couple of minutes to catch his breath. (R. 269-72)

Schneiders stated he has good days and bad days. On a bad day, he curtails almost all activities and spends most of his time sitting in a chair with his inhalers next to him. In a typical week, he may leave his house only once or twice. He does not go shopping on a regular basis. He can drive, but stated that when he starts to cough, he sometimes is "on the verge of blacking out," so he has to pull over. He stated this has happened "too many times to count" during the past year, with the most recent occasion being about a week prior to the hearing. He does very little around the house. He does not cook and is not able to do cleaning. He can lift a twenty or thirty pound item and carry it twenty or thirty feet, but he limits his lifting activities due to his breathing problems. (R. 272-75)

Schneiders takes naps fairly regularly. He stated at night, some of his medications make it hard for him to fall asleep, or cause him to sleep for only three or four hours at a time. If his medication wears off during the night, he may wake up gasping for air. (R. 273-74)

Schneiders stated he has blacked out several times due to coughing. On three occasions, he went to the hospital when he blacked out. He stated he is addicted to nicotine, and has been smoking since age seventeen. At the time of the hearing, he was smoking from two cigarettes to a whole pack each day. He said his doctors have advised him to quit smoking for many years, and he has tried to quit but has not been successful. (R. 276-77, 282) The day before the hearing, he smoked "[f]our or five" cigarettes. (R. 282) He used to smoke three or four packs of cigarettes a day, but cut back right after his "first attack," in December 2002. (R. 282) Other than failing to quit smoking, Schneiders stated he has never declined any treatment doctors have offered him. (R. 283)

In Schneiders's opinion, he would be unable to return to doing cleaning jobs because "the cleaning solutions and chemicals . . . just aggravated [his] condition." (R. 277) He also opined he would be unable to work at a production job that required him to be on his feet. (*Id.*)

Schneiders stated he never filed a worker's compensation claim on any of his jobs for his breathing problems. He collected unemployment benefits for awhile after the sheet rock job ended, but he did not apply for unemployment after his last job because, according to Schneiders, he was unable to work and he felt "it would have been fraudulent to actively seek work and then not be able to do it." (R. 279) He has not applied for any jobs since his last sheet metal job, which ended the first week in January 2003. (R. 479, 285; *see* R. 89)

Schneiders stated he is unable to work due to shortness of breath. According to him, he has had five "attacks" since 2002. He went to the emergency room for three of the incidences. (R. 281-82) When he has a coughing spell, he has to stop whatever he is doing and sit down. He cannot lie down but must remain somewhat upright. It typically takes him fifteen to thirty minutes to recover, depending on the severity of the attack, and he will be fatigued for awhile. (R. 284)

Schneiders is between 5'8" and 5'9" tall. At the time of the hearing, he weighed 208 pounds. He stated doctors have never advised him to lose weight. (R. 283) According to Schneiders, at least two of his treating physicians have stated he is unable to work. (R. 287-89)

### 2. Schneiders's medical history

The record contains evidence of Schneiders's medical history back as far as 1996. However, Schneiders's amended alleged disability onset date is January 8, 2002. (*See supra*, note 1) As noted above, Schneiders did not seek treatment for his condition for several years. The record indicates he saw Robert Stewart, M.D. on September 20, 1996, when the doctor opined Schneiders "simply ha[d] bronchitis from smoking," as well as gastroesophageal reflux disease. (*See* R. 212) He did not seek treatment again until November 2002. Therefore, the court's examination of his medical history will begin at that time.

On November 8, 2002, Schneiders was seen in the emergency room after apparently coughing until he passed out. He gave a history of an "ongoing cough for several weeks to the point where he [was] short of breath a lot and he [slept] sitting up in a chair." (R. 142) A chest X-ray showed Schneiders's lungs to be "essentially clear," with a possible diagnosis of bronchitis. (R. 145) Doctors opined the syncopal episode was "probably secondary to severe reactive airway and hypoxemia," or possibly a "sleep apneic-type condition." (R. 143) Doctors prescribed prednisone, an Albuterol inhaler, Atrovent, and Flovent, and directed him to follow-up as needed. (R. 143-44)

The next evidence that Schneiders sought medical treatment was another visit to the emergency room on May 26, 2003, due to "a coughing episode." (R. 139) Schneiders stated he had not sought medical treatment since his last ER visit because he had no money to see a doctor. He gave a history of "a chronic cough for the last nine months or so."

(R. 139) He stated he smoked two packs of cigarettes per day. (*Id.*) A chest X-ray was negative. Schneiders was treated with prednisone, albuterol and Atrovent, which "did greatly relieve [his] symptomatology." (R. 140) He was discharged with prescriptions for five days' worth of prednisone, one albuterol inhaler, one Atrovent inhaler, and one Flovent inhaler, with no refills of any of these medications. He was directed to follow up with his family doctor, and to return if his symptoms worsened. His discharge diagnosis was "[a]cute chronic obstructive pulmonary disease exacerbation." (*Id.*)

Schneiders went to the ER again on August 4, 2003, "complaining he has had trouble breathing for the last nine months." (R. 137) Schneiders stated he was becoming increasingly short of breath; he had a constant, worsening cough; and he could not afford his medications. He continued to smoke one to two packs of cigarettes per day. Schneiders stated Social Services had refilled his prescriptions in May 2003, but he had been unable to afford any refills since that time, and his symptoms were worsening. He also reported he had "lost his job doing sheet metal because he coughed too much," and stated he was doing "odd jobs." (*Id.*) Schneiders was given a breathing treatment in the ER, and prescriptions for a Flovent inhaler, Albuterol inhaler, and prednisone. He was "strongly admonished to stop smoking," and to fill his prescriptions. (R. 138)

On August 13, 2003, Schneiders was seen at Siouxland Community Health Center ("SCHC") seeking refills of his prescriptions from the ER. He exhibited a dry cough, which Schneiders stated caused him chest pain. He stated he had reduced his smoking to about one pack per day "with his current exacerbation, however, he usually smokes [three packs per day]." (R. 155) He was given a nebulizer treatment. He was started on Advair Discus, given enough prednisone for five days, and given a coupon for Proventil. (*Id.*)

Schneiders returned to SCHC on August 20, 2003, seeking refills of Flovent, Atrovent, and Albuterol. He was started on a pharmacy plan that would help fund his medications. (R. 154) Schneiders returned for follow-up on August 25, 2003. He

complained of increasing shortness of breath over the previous several months. He stated he had experienced four episodes since November 2002, when he coughed so hard that he became convulsant. He stated he had to sleep upright, using three pillows, and he had raised the head of his bed four inches. He was still smoking one pack of cigarettes per day. He reported some visual changes during his coughing. Upon examination, he was "more comfortable with putting his arms up in the air and sitting up." (R. 153) His lungs "revealed a couple rhonchi and a couple end-expiratory wheezes," but Schneiders said he was feeling clear that day after adjusting his medications. (*Id.*) Doctors added Theo-Dur to his medications, ordered a chest x-ray and other tests, and directed Schneiders to return in two to three weeks. (*Id.*)

On September 2, 2003, Schneiders was seen in the Pulmonary Function clinic at Mercy Medical Center for various tests in connection with his diagnosis of COPD. (R. 131-36) Testing showed "[v]ery severe air flow obstruction with significant reversibility after bronchodilators." (R. 131) The "study indicate[d] significant reversibility and may qualify for diagnosis for asthma along with chronic obstructive pulmonary disease." (*Id.*) X-rays taken the same day showed Schneiders's lung volumes were "essentially normal," and there were no negative findings. (R. 128)

Schneiders returned to SCHC on September 11, 2003, complaining of continued shortness of breath and headaches. He rated his pain level at 10/10. He stated he was "coughing and coughing and the headache seem[ed] worse with this coughing." (R. 151; *see* R. 152-53) He was continuing to smoke one pack of cigarettes a day. Doctors noted Schneiders obtained significant relief from his medications, and "one of his biggest problems [was] just that he [was] not buying more meds." (*Id.*) He was started back on prednisone, and also was started on Doxycycline. He was given a nebulizer treatment. Doctors expressed concern that Schneiders's ongoing coughing could be causing damage to small blood vessels, resulting in his headaches. They suggested a CT scan. They again

counseled Schneiders to stop smoking, but he responded that he had cut down from three packs to one per day and was doing the best he could. (*Id.*)

Schneiders was seen at SCHC again on September 15, 16, and 17, 2003 (R. 149-50), and October 1, 3, 6, 8, and 20, 2003 (R. 172-76). His symptoms remained basically unchanged. Schneiders sought further assistance with his medications. A physician's assistant who examined him noted Schneiders was "a challenge because of the lack of funds and his persistent smoking. He would prefer to use his money to buy cigarettes than to save for the meds." (R. 149)

On October 3, 2003, Schneiders underwent a CT scan of his head. The scan revealed "[c]alcification in the intracranial carotid arteries bilaterally." (R. 177) Schneiders was scheduled for magnetic resonance angiography (MRA) on October 17, 2003 (*see id.*), but the record contains no evidence that he followed up with the MRA.

On October 20, 2003, Schneiders underwent pulmonary function testing in accordance with Social Security Administration protocol requirements. (R. 156-63) Spirometry results indicated Schneiders's breathing improved following bronchodilation. (*See id.*, R. 189)

Schneiders was seen at SCHC on November 3 and December 4, 2003, with basically no change. (R. 171) Schneiders requested some type of written documentation that he was unable to work, which was declined. A physician's assistant noted peak flow testing indicated Schneiders had "a reversible lung condition if he took his meds," and managing Schneiders's disease was challenging because he did not take his medications as directed and could not afford other medications. Schneider refused to try Indocin for his headaches. The P.A. noted SCHC had "gone to great lengths to access medications for [Schneiders] and he refuses to pay the $11 co-pay for 2 meds," noting again that Schneiders "prefer[red] to spend his money purchasing cigarettes rather than the medications." (*Id.*)

On December 4, 2003, Lawrence F. Staples, M.D. reviewed the record and completed a Residual Functional Capacity Assessment regarding Schneiders. He found Schneiders could lift ten pounds occasionally and frequently, stand and/or walk at least two hours in an eight-hour workday, sit for about six hours in a normal workday, push/pull without limitation, and perform all types of postural activities occasionally. He noted Schneiders should avoid concentrated exposure to extreme heat and cold, humidity, and fumes. He found no other limitations on Schneiders's ability to work. (R. 181-89) On March 3, 2004, J.D. Wilson, M.D. reviewed the record and affirmed Dr. Staples's assessment. (R. 188)

When Schneiders returned to SCHC for follow-up on December 29, 2003, he refused to allow his vitals to be taken, complaining of a terrible headache. He was visibly irritated and cursed during the examination. He was scheduled to see a different doctor in the clinic the next week. A physician's assistant noted he would like to send Schneiders to see a pulmonologist for evaluation, but was unable to do so due to Schneiders's lack of funds or insurance. (*Id.*)

Schneiders saw a doctor at SCHC on January 6, 2004. He discussed his headaches, his concern that he had a family history of heart problems, his stress level, and his financial problems. He stated he had tried various means to quit smoking without success, and he was not willing to try Wellbutrin. After the doctor spent about thirty minutes with Schneiders in "face to face counseling and coordination of care," Schneiders refused further examination and left the clinic. (R. 167-69)

A social worker from SCHC talked with Schneiders on January 7, 2004, concerning his "recent conflict issues with clinic care." (R. 166) She advised Schneiders that doctors likely would bring up smoking cessation and weight management every time he was examined, as part of his ongoing disease management. He was being switched to a different doctor, Dr. Swanson, for continued care. Schneiders reported he was making

some progress in limiting his smoking. He did not smoke for two hours before bed, and not until he had been up in the morning for one hour. He was encouraged to lengthen these periods gradually. (*Id.*)

Schneiders was seen at SCHC for follow-up on January 29, 2004. Schneiders declined to start on prednisone again for a COPD flare. He was started on Elavil at night "to help his headaches." (R. 165) He agreed to keep using all of his inhalers. The doctor advised Schneider that his prognosis was quite poor, and he would probably be on oxygen within three years. He also advised Schneiders that frequently, "end-stage emphysema and COPD patients end up on Prednisone." (*Id.*) Schneiders declined a trial of Prozac to help his mood. He again was urged to quit smoking. (*Id.*)

Schneiders was seen for follow-up on February 19, March 10, April 20, April 21, May 7, June 2, and July 6, 2004. His condition showed little change over time, with continued intermittent exacerbations, and complaints that he could not fill his prescriptions due to financial problems. (R. 190-98) By August 2004, Schneiders was complaining of marked chest pain and waking at night with shortness of breath. He was treated with Solu-Medrol injections throughout August. (*See* R. 240-50) He continued to smoke, stating he would "never stop." (R. 241)


### 3.    *Vocational expert's testimony*

The VE clarified the nature of some of Schneiders's past work (*see* R. 289-90), and then the AlJ asked the VE to consider an individual of Schneider's age, education, and work experience, who can lift ten pounds frequently and twenty pounds occasionally, stand for two hours in an eight-hour workday, sit for six hours in an eight-hour workday; occasionally climb stairs, crawl, kneel, crouch, and stoop; and tolerate frequent exposure to extremes of heat, cold, humidity, dust, and fumes. (R. 291-92)

The VE stated the hypothetical individual would be precluded from performing any of Schneiders's past relevant work.  She stated the standing limitation would only allow sedentary jobs.  She noted the semi-skilled labor-type jobs Schneiders performed would not transfer to sedentary jobs.  However, the VE stated the individual would be able to perform "some sedentary unskilled jobs," such as surveillance system monitor (200 in Iowa; 13,000 nationally); a "final assembler . . . in the category of production workers" (900 in Iowa; 57,000 nationally); and an addresser, "in the category of word processors" (300 in Iowa; 24,000 nationally).  (R. 292-93)

The ALJ then asked the VE to consider the same hypothetical individual, but he would have to miss three or more days of work per month due to coughing spells.  The VE stated that would preclude the individual from all competitive employment.  (R. 293)  Similarly, if the individual described in the first hypothetical question were "unable to sustain an eight-hour workday due to fatigue," the individual would be unable to perform any competitive employment.  (*Id.*)

If the hypothetical individual would have to take at least one unscheduled thirty-minute break per week to deal with a coughing spell, the VE stated "it would come close to precluding" competitive employment, depending on how an employer might react to the unscheduled breaks.  (R. 293-94)


### 4.    The ALJ's decision

The ALJ found that although Schneiders performed some work after his alleged disability onset date of January 8, 2002, he has not performed substantial gainful activity since his alleged onset date.  (R. 16)

The ALJ found Schneiders "has asthma with chronic pulmonary obstructive disease, an impairment that is 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal . . . one of the impairments listed in [the regulations]."

(R. 17) The ALJ further found Schneiders's GERD and mood disorders to be non-severe in nature, noting he has not claimed any functional limitations due to those conditions, and he declined treatment for his mood disorder. (*Id.*)

The ALJ found Schneiders's subjective complaints of disability not to be fully credible, citing the following reasons:

> The claimant has been smoking since the age of 17 [and] currently smoked up to one pack per day; however, he admitted that the medical community had advised [him] to stop a long time ago which was evident within the medical records as early as 1996 . . .; however, the claimant continued to smoke. He claimed inability to work due to not breathing. The medical record documented that the claimant's condition stabilized with proper treatment, but the claimant failed to adhere to treatment citing limited financial resources. The undersigned finds as credible the claimant's assertions that his severe restrictive airway disease has imposed some functional limitations; however, the undersigned raises the question as to the claimant's priority improving his overall functioning based on the well-documented failure to follow prescribed treatment due to the cost of medication versus the willingness to expend finances to maintain a smoking habit. To this extent, the undersigned finds the claimant not fully credible.

(R. 20)

The ALJ determined that Schneiders retains the following residual functional capacity:

> [T]o perform work which requires lifting 20 pounds occasionally and 10 pounds frequently; standing 2 hours out of an 8-hour workday with normal breaks; sitting 6 hours out of an 8-hour workday with normal breaks; frequently balancing; occasionally climbing stairs, crawling, kneeling, crouching and

14

> stooping but no climbing ladders, ropes or scaffolds. The
> claimant would also be able to work in environments with
> exposures to heat, cold, humidity, dust or fumes on a frequent
> basis.

(R. 20) The ALJ further found that based on his mood disorder, Schneiders would have "mild restriction of daily activities, mild difficulties maintaining concentration, persistence and pace; mild restriction of social functioning and no periods of decompensation." (*Id.*)

The ALJ adopted the VE's opinion in finding Schneiders is unable to return to any of his past relevant work, but he still retains the capacity to perform a significant number of unskilled, sedentary jobs such as surveillance system monitor, final assembler, and addresser. (R. 21-22) Therefore, the ALJ concluded Schneiders was not disabled at any time through the date of the ALJ's decision. (R. 22, 23)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785

(8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's

residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox*

*v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.");

*Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding

the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Schneiders argues the ALJ erred in three respects: (1) presenting an incomplete hypothetical question to the VE; (2) finding Schneiders's allegations not to be credible; and (3) concluding Schneiders "failed to follow prescribed treatment and plac[ing] too much a factor on [Schneiders] failing to cease smoking." (Doc. No. 11, p. 4) The court will discuss each of these arguments in turn.

### A. Hypothetical Question

Schneiders argues the ALJ's hypothetical question to the VE was incorrect and contrary to limitations placed upon Schneiders by his doctors. In his hypothetical question to the VE, the ALJ stated the hypothetical individual would be able to tolerate "frequent only exposure to extremes of heat, cold and to humidity and to dust and fumes." (R. 292) Schneiders argues he could not "work in an environment exposed to cold, humidity, dust or fumes at anytime much less on a frequent basis." (Doc. No. 11, p. 4) He noted the state agency consultant found he should avoid "concentrated exposure" to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (*Id.*, citing R. 185)

The Commissioner argues none of Schneiders's doctors placed similar restrictions on him; rather, they repeatedly advised Schneiders to quit smoking. In addition, the ALJ argues the Physical Residual Functional Capacity Assessment form defines "frequently" as "less than two-thirds of the time." She argues "concentrated" exposure, which the consultant found Schneiders should avoid, "would equate to constant exposure or at least to exposure two-thirds or more of the time." (R. 12, pp. 14-15) The Commissioner

argues further that even if the hypothetical should have limited exposure to these environmental conditions more extensively, the error is harmless because none of the jobs the VE stated the hypothetical individual could perform involves exposure to these environmental conditions. (*Id.*, p. 15)

Courts apply harmless error analysis to judicial review of administrative decisions. In the context of judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (applying harmless error analysis; noting standard is "whether the ALJ would have reached the same decision denying benefits" even absent the error); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (harmless error analysis appropriate to supply missing dispositive finding when ALJ considered evidence, "just not properly"); *Hall v. Comm'r of Social Security*, 148 Fed. Appx. 456, 464 (6th Cir. 2005) (noting *Wilson v. Comm'r of Social Security*, 378 F.3d 541 (6th Cir. 2004) left open possibility of harmless error when ALJ fails to address treating source opinion, but also noting "the scope of the harmless error inquiry is still undetermined"); *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error analysis); *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991) (same).

In the present case, the court finds the ALJ's assessment of Schneiders's ability to tolerate heat, cold, and environmental pollutants was incorrect. The record overwhelmingly supports the conclusion that Schneiders would be unable to work in an environment where he would be exposed to extremes of cold, humidity, dust, or fumes, for even short periods of time. However, the court further finds the error was harmless because, as the Commissioner notes in her brief, none of the jobs the VE stated the hypothetical individual could perform would involve exposure to those environmental conditions.

### B.  Credibility Analysis

Schneiders argues the ALJ erred in failing to make "specific credibility findings" regarding his testimony, and did not provide adequate reasons for finding his testimony not to be credible.  (Doc. No. 11, pp. 5-6)  The court disagrees.  The ALJ evaluated Schneiders's testimony pursuant to the standards set forth in *Polaski*.  The ALJ noted Schneiders's condition responded well to prescribed treatment, but Schneiders did not follow his doctors' recommendations.  Schneiders consistently complained of a lack of funds to pay for his medications.  However, the record indicates Schneiders could have obtained his necessary medications for an $11.00 co-payment, but he chose to use his money to purchase a pack or more of cigarettes per day instead.  The court finds Schneiders's continued expenditure of funds to purchase cigarettes is inconsistent with his claim that he could not afford an $11.00 co-payment to obtain medications that would alleviate his symptoms.  *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claimant's statement that he could not afford medications was contradicted by lack of evidence that he "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication").  Schneiders went for a long period of time without seeking treatment at all, refused some recommended treatment, and failed to take his medications as prescribed.  The court finds the reasons cited by the ALJ support his determination that Schneiders's subjective complaints were not fully credible.


### C.  Failure to Follow Prescribed Treatment; Emphasis on Smoking

Schneiders argues the ALJ erred in finding he failed to follow prescribed treatment, and the ALJ relied too heavily on Schneiders's failure to stop smoking.  Schneiders claims the ALJ's credibility finding was based "solely upon his non-compliance with doctor's advice to quit smoking."  (Doc. No. 11, p. 6)  The court finds otherwise.

Although the ALJ placed emphasis on Schneiders's failure to stop smoking, that was not the sole basis of his decision. Rather, as noted above, the ALJ's decision that Schneiders's testimony was not credible was based on several factors. The ALJ did not deny Schneiders's claim for benefits on the basis that Schneiders continued to smoke, despite doctors' recommendations that he stop. The basis for the ALJ's conclusion that Schneiders remained able to work was the fact that his condition is treatable – indeed, at least at some point during his claimed period of disability, doctors indicated his condition could be reversible – with medications. Yet despite the favorable prognosis if he took prescribed medications, Schneiders nevertheless chose to spend all of his available funds on cigarettes, rather than saving a small amount of money to pay for his medications. A claimant's decision not to follow prescribed treatment may undercut his allegations that he is completely unable to work. *See Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (citing *Harwood v. Apfel*, 186 F.3d 1039, 1045 (8th Cir. 1999); *Black v. Apfel*, 143 F.3d 383, 386-87 (8th Cir. 1998)).

The court finds the record contains substantial evidence to support the ALJ's determination that Schneiders retains the residual functional capacity to perform a significant number of unskilled, 1sedentary jobs, and he therefore is not disabled.

## V. CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[2] to the Report and Recommendation in accordance

---

[2]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 7th day of March, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT